UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DWAYNE WALTERS | * | CIVIL ACTION NO. 18-5811 |
| | * | |
| VERSUS | * | SECTION: "E"(1) |
| | * | |
| ANDREW SAUL, ACTING | * | JUDGE SUSIE MORGAN |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************** | * | |

<u>REPORT AND RECOMMENDATION</u>

The plaintiff, Dwayne Walters, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. § 423. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 17) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 18) be GRANTED.

**<u>Procedural Background</u>**

Mr. Walters applied for DIB on January 29, 2015, asserting a disability onset date of October 28, 2014. He alleged the following illnesses, injuries, or conditions:  lumbar degenerative disc disease and gum disease. On February 3, 2016, his claim was denied by the state agency. The Disability Determination Explanations concluded:

> [t]he medical evidence shows that although you experience back and right knee discomfort, you are still able to move about and you can use your arms, hands, and legs in a satisfactory manner. Although you have stated that you have gum disease, with the available information we cannot determine a disabling impairment. Though you stated you are depressed at times, your records do now show any treatment for this condition. The medical evidence does not show any other disabling condition that would prevent you from working.

R. at 77.

Mr. Walters obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 13, 2017. On June 7, 2017, the ALJ issued an adverse decision. Mr. Walters timely appealed to the Appeals Council, which denied review on April 26, 2018.

On June 11, 2018, Mr. Walters filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 13, 14). The parties filed cross-motions for summary judgment. (Rec. Docs. 17, 18). Mr. Walters is represented by counsel.

**Evidence in the Record**

*Mr. Walters' Reports and Testimony:*

Mr. Walters completed a Function Report on April 7, 2015. R. at 215-222. He reported that he cannot bend down to the floor, he cannot lift much weight, and cannot ride or drive. R. at 215. He reported that his medication makes him sleepy most of the time. R. at 215. He described a typical day as watching some TV, eating something, and going for a walk outside with the aid of his walker. R. at 216. He folds clothes, but said that after about 10-15 minutes he begins to hurt. R. at 216. He reported that he sometimes wakes up from sleeping because of pain. R. at 216. He reported needing help with some personal care including putting on socks and pants and washing his legs and feet because he cannot bend down that far. R. at 216. Mr. Walters can prepare a sandwich or heat something in the microwave, but his wife or daughter prepare meals for him. R. at 217. He reported that he used to help with cooking but can no longer do so because the heat from the stove bothers him, he tires out quickly, and he cannot lift heavy pots. R. at 217. He does not do outside chores but helps with the laundry by putting clothes in the laundry. R. at 217. He reported that he could lift about 3 or 4 pounds and could walk about 50 feet. R. at 220.

2

Mr. Walters completed a pain questionnaire on April 13, 2015. R. at 238-40. He described his lower back pain as aching, crushing, stabbing, throbbing, and stinging. R. at 238. He reported the pain began in 2006 or 2007 and that it began affecting his activities around 2009. R. at 238. He reported using a walking cane, a back brace, and bone fusion machine daily. R. at 239.

A hearing before the ALJ was held on March 13, 2017. R. at 33. Walters was represented by counsel. R. at 33.

Mr. Walters testified that the last time he was working he worked as a delivery truck driver for Coburn's Supply. R. at 44-45. He stopped working when he had back surgery on October 29, 2014. R. at 45.

Mr. Walters described his back pain as a sharp pain on his right lower back and sometimes a dull burning pain in his back. R. at 49. He testified that his pain got worse following his surgery. R. at 49. He testified that he used a ball stimulator and continues to use it about once a month. R. at .49-50. Mr. Walters described his knee pain as causing his whole right leg to go numb. R. at 51. Sometimes he loses his balance. R. at 51.

Mr. Walters testified that he can only walk about 100 yards,  and then he loses his balance. R. at 46; 52. He testified that he cannot pick up anything heavy. R. at 46. He said he lays down if his back hurts, or takes a shower and let hot water run over it, or lays on a heating pad. R. at 46. He testified that he can stand for about 35-40 minutes before he needs to sit down because of a "dull sharp pain" in his back. R. at 52.  He testified that when he bends over, he gets a sharp pain in his back. R. at 52.

Mr. Walters testified that he able to drive, "to a certain extent." R. at 48. He drives himself to his appointments at Lallie Kemp, which is five miles from where he lives. R. at 48. If he drives long distances his back hurts from bouncing up and down. R. at 53. He testified that he helps his

wife with chores, including putting clothes in the washer, sweeping around the house, and taking out the trash. R. at 53.

*Medical Records:*

On July 9, 2014, x-rays of the lumbar spine were performed at the North Oaks Medical Center. R. at 366. Minimal degenerative disc disease findings at L5-S1 were observed. Id.  Mr. Walters returned to the North Oaks Medical Center on July 12, 2014 for an MRI of the lumbar spine without contrast. R. at 364. At L5-S1, disc degeneration and protruded disc herniation with annular fissure was observed and noted to be similar in magnitude to 8/23/11.[1] R. at 364. It was noted that "[t]he disc margin abuts the left S1 root without nerve root displacement or compression." Facet joints were hypertrophic. And there was "severe right foramen stenosis and moderate to severe left neural foramen stenosis." Id.

On September 2, 2014, Mr. Walters visited Cypress Pointe Surgical Hospital in Hammond, Louisiana, reporting low back pain with an intensity of 9 out of 10. R. at 293.  It appears surgery was scheduled for October 30, 2014. R. at 291. On September 3, 2014, Mr. Walters returned to Cypress Point for a  2-level lumbar discography (at L4-L5 and L5-S1) with negative control. R. at 286.  A CT scan of the lumbar spine without contrast was performed thereafter on the same date. R. at 284. The L5-S1 disc was found positive for abnormal nucleogram, with posterior annular fissure with contrast extravasation into the epidural space. R. at 284-85; 287. It was noted that positive familiar pain response was elicited from the patient upon injection at the L5-S1 level. R. at 287.

---

[1] The record includes a copy of the August 23, 2011, MRI. R. at 367-68. Degenerative disc disease of the lumbar spine, greatest at L4-5 resulting in moderate to severe bilateral neural foraminal narrowing with possible mass effect on the exiting L4 nerve roots was noted. Id.

Mr. Walters presented to the NeuroMedical Center Clinic on October 3, 2014, complaining of back pain with an intensity of 8 to 9 on a 10-point scale. R. at 295. The following medications were listed: Soma 350 mg; Opana ER 5 mg; Crestor 10mg; Norco 10-325 mg; Tizanidine HCL. R. at 297. His gait and posture were recorded as normal. Id. His strength in the upper and lower extremities was normal. Id. There was no paraspinal muscle spasm. Id. Dr. Erik Oberlander reported that "Mr. Walters continues with severe lower back pain and right leg pain. He had a positive discography at L5-S1 with L4-5 normal control. He has failed conservative therapy with physical therapy and injections. He is interested in the surgery." R. at 298. The risks and benefits were discussed, and Mr. Walters was ready to proceed. R. at 298.

On October 30, 2014, Mr. Walters underwent the following surgical procedures at Cypress Pointe: a right L5-S1 transforaminal interbody fusion with transpedicular and far lateral decompression of the exiting and traversing nerve; pedicle screw instrumented fusion from L5-S1; and post lateral fusion from L5-S1. R. at 299. He tolerated the procedure well, his postoperative course was routine, and he was discharged on November 1, 2014. R. at 302. He was instructed to wear a brace with ambulation and to avoid driving, bending, lifting, and twisting. R. at 302.

Mr. Walters followed up with Dr. Oberlander at the NeuroMedical Center Clinic on November 14, 2014, complaining of pain with an intensity of 8 out of 10, but reporting that he felt he was slowly getting better. R. at 346. He complained of back pain, stiffness, leg pain at night and leg pain with exertion, but denied joint pain or swelling, muscle weakness, or sciatica. R. at 347. It was noted that he "still [has] a long way to go in the healing process." R. at 348.

An x-ray of the lumbar spine was performed at Cypress Point on December 9, 2014. R. at 303. There was "mild moderate disc space narrowing at L2-L3 and severe narrowing at L5-S1." Id. Alignment was satisfactory and vertebral body height was maintained. Id. The surrounding

soft tissues demonstrated atherosclerotic disease. Id.    An impression of mild moderate degenerative disc disease was reported. Id.

Mr. Walters returned to the NeuroMedical Center Clinic on December 12, 2014, reporting pain with an intensity of  7 out of 10. R. at 341. It was noted that his Cypress Pointe x-rays "look good," but that he was still having a lot of pain and requested pain medicine. R. at 343. Id.

The first medical record in the file reflecting Mr. Walters' visits with his treating physician Dr. Anthony Zerangue is for a December 30, 2014 appointment, although the visit is noted to be a "follow-up" for "med refills." R. at 353. Mr. Walters was marked positive for back pain. Id.  His gait was noted to be antalgic. Id.

Mr. Walters returned to the NeuroMedical Center Clinic on January 15, 2015, complaining of pain with an intensity of 8 out of 10. R. at 337. He reported a sharp shooting pain on either side of his back and some muscle spasms in his right leg at times. Id.  He still required pain medication, which he was receiving from his primary care practitioner. R. at 339.  A CT scan to evaluate his fusion and check his hardware was suggested. R. at 339. It was noted that Mr. Walters was "still unable to work and may try to get disability due to the fact that he is unable to return to his job with restrictions." Id.

Mr. Walters returned to Dr. Oberlander at the NeuroMedical Center Clinic on March 6, 2015. R. at 333. A CT scan was reviewed, and Dr. Oberlander concluded that "he appears to be solidly fused after his surgery." R. at 335. It was noted that Mr. Walters "still has a bad lower back pain." Id.  Dr. Oberlander reported that Mr. Walters needed more time to heal and that it would take a year. Id.  He noted that Mr. Walters should remain out of work and should follow up in six months. Id.

Mr. Walters returned to Dr. Zerangue on April 1, 2015, for medication refills, complaining of arthritis in his shoulder and hip and his right leg going numb. R. at 352. He was marked positive for joint pain and back pain. Id. His gait was marked normal, although the notes report that Mr. Walters uses a cane to walk and has an antalgic gait. Id.

On April 7, 2015, two x-rays of the right hip were performed at the North Oaks Medical Center. R. at 362. There was no suspicious hip abnormality or asymmetry or change in hip regions. Id. Two x-rays of the right shoulder were also performed. R. at 363. Osteoarthritis mostly affecting the acromioclavicular joint was observed. Id.

Mr. Walters followed up with Dr. Zerangue on June 25, 2015, for medication refills. R. at 351. He was positive for back pain and depression. R. at 351. His gait was noted to be antalgic. Id. Mr. Walters' back pain was reported to be bothersome "but gradually slightly" improving, "though not ever to the point that he could do desk work." Id.

Mr. Walters followed up with Dr. Zerangue on September 21, 2015, for medication refills. R. at 433. He was noted positive for back pain. Id. His gait was noted to be slow, stiff, and antalgic. Id.

On October 6, 2015, a consultative examination was performed by Dr. John Loupe. R. at 378. Mr. Walters reported that his condition was worse than prior to his surgery and that he felt depressed. Id. He reported taking 4 Lortab 10mg per day prior to the surgery and 6 Lortab 10mg afterwards, and he still feels pain. Id. He reported taking Ciproheptaine 4mg twice a day as an anti-depressant. Id. No joint swelling, tingling, tenderness, or muscle weakness was noted. R. at 379. Upon examination, Dr. Loupe found Mr. Walters had full range of motion in his lumbar spine. Id. Dr. Loupe observed that with forward flexion, Mr. Walters reverses his lordotic curve and can get down to almost his ankles. Id. He had a negative Trendelenburg test. Id. He was able to lift

7

his right leg with the left foot on the ground and vice versa. Id.  Dr. Loupe observed an obvious effusion present in the right knee with a positive Lachman test. R. at 380. Severe pain was noted on the medial aspect of the joint with compression in the area with hyperflexion and varus valgus stresses applied. Id.  Although range of motion upon flexion and extension of the left knee were within normal limits, his right knee lacked 5 degrees of extension. Id.  Dr. Loupe noted impressions of: failed L5-S1 lumbar spinal fusion, effusion in the right knee, internal derangement of the right knee, possible anterior cruciate ligament tear, and possible medial meniscus tear, right knee. R. at 381. Dr. Loupe opined that a re-fusion of the lumbar spine was needed. R. at 381. He concluded that Mr. Walters has "20% impairment to the body as a whole and 10% impairment to the right knee and is disabled from work." R. at 381.

Mr. Walters presented to the Lallie Kemp Medical Center on October 8, 2015, and was seen by nurse practitioner Rosalind Mobley. R. at 421. Mr. Walters requested a referral to gastroenterology and ENT. Id.  He complained of dysphagia since December 2014. R. at 422. He complained of right knee pain for three months that was mildly relieved with a Norco regimen. Id.  A past medical history of high cholesterol and chronic back pain was noted. Id.  Mr. Walters was noted positive for arthralgias. Id.  Normal range of motion was noted and Mr. Walters exhibited no edema or tenderness. R. at 423.

Mr. Walters presented to the Lallie Kemp clinic for a primary care visit with Tashawn Lavette Mustiful, MD, on November 16, 2015. R. at 417. Mr. Walters was described as 52-year old right-handed male smoker with chronic back pain. Id.  He was noted to have a stable gait, and muscle tone and strength in the bilateral upper and lower extremities was intact. R. at 419. The assessment listed active problems as health care maintenance and right knee pain. R. at 421. An issue related to back pain was not listed. Id.  The "plan" included weaning smoking to none and

reducing blood pressure, as well as notes concerning treatment for abnormal liver function test with Dr. Zerangue and testing related to dysphagia. Id.

On December 17, 2015, Mr. Walters returned to Dr. Zerangue for medication refills. R. at 432. Lower back pain was reported to be persistent and severe. Id. Mr. Walters' gait was noted to be antalgic. Id. It was noted that medications "do improve" quality of life. Id. Impressions included lower back pain "100% disabled per Dr. Oberlander." Id.

Mr. Walters attended a psychological consultative examination with Sandra B. Durdin, Ph.D., on January 18, 2016. R. at 385. Mr. Walters drove himself to the examination. Id. Dr. Durdin observed that Mr. Walters' gait and posture were normal and that he had a cane, although she noted that it was not prescribed. Id. Dr. Durdin determined Mr. Walters had no mental disorder. R. at 387. She noted that Mr. Walters was not impaired in his ability to understand and carry out simple instructions, handle familiar detailed instructions, sustain attention for two-hour blocks of time, and get along with others. Id. She noted that Mr. Walters' ability to sustain a forty-hour work week was not impaired by a mental disorder. Id.

Mr. Walters presented to the Lallie Kemp clinic for a primary care visit with Dr. Mustiful on February 29, 2016, to follow up for RV dysphagia, dermatitis, and an abnormal liver function test. R. at 405. He was noted to have a stable gait, and muscle tone and strength in the bilateral upper and lower extremities was intact. R. at 407. The assessment listed the following active problems: allergic rhinitis, dermatitis, abnormal LFTs, dysphagia, health care maintenance, right knee pain. R. at 415. The "plan" included weaning smoking to none, reducing blood pressure, "[l]umbar surgery per Dr. Oberlander," and a topical steroid cream and atarax for dermatitis. Id.

Mr. Walters followed up with Dr. Zerangue on March 21, 2016, for medication refills and complaining that he was losing feeling in his right hand. R. at 431. It was noted that Mr. Walters

reported persistent severe lower back pain. Id. Neck pain was also reported. Id.  Dr. Zerangue noted that Mr. Walters looked uncomfortable while sitting and standing, that he needed to change positions, and that he had a slow, stiff gait and tenderness in the lumbar spine region. Id. Impressions included hand paresthesias, knee pain, chronic lumbago, and depression. Id.  The plan included x-rays of the knees and cervical spine, MRI of the cervical spine and then a neurosurgery appointment, and to "complete lawyer's disability form." Id.  It was noted that NSAIDs were not helpful for knee pain. Norco and Soma were prescribed.

On March 29, 2016, Dr. Zerangue filled out a form with questions about Mr. Walters' impairments. R. at 449. Some questions called for narrative responses, but most of the responses included check box lists or "yes/no" responses to circle. Id.  Dr. Zerangue noted that Mr. Walters has degenerative disc disease and has symptoms of decreased range of motion of the spine, morning stiffness, severe pain, radicular symptoms, muscle weakness, and problems ambulating. Id.  He reported that Mr. Walters was not a malingerer. Id.  He reported that Mr. Walters has chronic severe pain in the back especially but also neck and knees with exacerbation of pain with repeated or persistent loading. Id.  He reported Mr. Walters can walk half a block without pain, can sit for 15 minutes before needing to get up and can stand for 10 minutes before needing to sit down or walk around. R. at 450.  He reported that Mr. Walters can sit for two hours in an eight-hour work day and can stand or walk for two hours in an eight-hour work day. Id.  He reported that Mr. Walters must be allowed to walk two to three minutes every 20 minutes. Id.  He reported that Mr. Walters would need a job that permits shifting in position from sitting, standing, and walking and that he would need unscheduled breaks of 30 minutes four to five times in an eight-hour work day. R. at 451. He reported that Mr. Walters can lift 10 pounds occasionally, 20 pounds rarely, and can never lift higher weights. Id.  Dr. Zerangue also reported that Mr. Walters was

likely to be absent from work more than four days per month as a result of his impairment or treatment. R. at 452.

On July 19, 2016, Mr. Walters presented to the Lallie Kemp clinic for a follow up primary care visit with Dr. Mustiful. R. at 397. He was noted to have a stable gait and muscle tone, and strength in the bilateral upper and lower extremities was intact. R. at 399. The active problem list and plan were the same as on February 20, 2016. Id.

Mr. Walters followed up with Dr. Zerangue on June 24, 2016, for medication refills and complaining of back pain and swelling. R. at 430. It was noted that Mr. Walters was unable to function or even sit without severe pain. Id.  Mr. Walters' gait was noted to be antalgic and it was noted that he stood for most of the appointment. Id.  It was noted that a musculoskeletal/back exam was unchanged. Id.

Mr. Walters returned to Dr. Zerangue on September 23, 2016, for medication refills and complaining that his right knee was swollen and went out on him. R. at 429. Flat affect and antalgic gait were noted. Id.  Impressions included chronic lumbago and knee pain. Id.

Mr. Walters returned to Dr. Zerangue for medication refills and complaining of arthritis in the knees on October 16, 2016. R. at 428. Impressions included knee osteoarthritis and "disabled 20 chronic lumbago." Id.

*Vocational Expert Testimony:*

Vocational Expert Patty Knight testified at the hearing before the ALJ on March 13, 2017. R. at 33. She classified Mr. Walters' past work as follows:  Warehouse Worker (DOT 922.687-058), medium, unskilled, SVP of 2, though Mr. Walters was performing the job at a heavy level because he reported lifting up to 100 pounds; Delivery Driver (DOT 906.683-022), medium, semi-skilled, SVP of 3; Forklift Operator (DOT 921.683-050), medium, semi-skilled, SVP of 3; Stock

Clerk (DOT 299.367-014), heavy, semi-skilled, SVP of 4; and Machine Operator, classified as a

mixer and blender (DOT 520.685-154), heavy, semi-skilled, SVP of 4; Janitor (DOT 382.664-010,

medium, semi-skilled, SVP of 3. R. at 54.

      The ALJ asked the vocational expert to consider a hypothetical individual with Mr.

Walters' work history, a high school diploma, and 51 years of age, who could lift and/or carry 20

pounds occasionally and 10 frequently, who could stand and/or walk a total of four hours out of

an eight hour work day; who could sit six hour out of an eight hour work day; who could push and

pull occasionally with the right lower extremity and frequently with the left lower extremity; who

could never climb ladders, ropes, and scaffolds; who could frequently climb ramps and stairs; who

could frequently balance and stoop; who could occasionally kneel and crouch, and who must avoid

all exposure to moving machinery and unprotected heights. R. at 55. The vocational expert testified

that such an individual could perform the following positions: Cashier (DOT 211.467-030), light,

unskilled, SVP of 2, with 1,256,222 jobs available in the United States and 16,827 in Louisiana,

but with a 70% reduction in available jobs because of the standing and walking limitation;

Reception and Information Clerk (DOT 237.367-018), light, unskilled, SVP of 2, with 88,540 jobs

available in the United States and 1,305 in Louisiana, but with a 70% reduction in available jobs

because of the standing and walking limitation; General Office Clerk (DOT 222.587-038), light,

unskilled, SVP of 2, with 210,469 jobs available in the United States and 2,653 in Louisiana, but

with a 70% reduction in available jobs because of the standing and walking limitation.

      Mr. Walters' attorney asked the vocational expert how the hypothetical individual could

perform the listed jobs if he was limited to standing and walking for six hours when "light" work

requires standing and walking for six hours in an eight-hour work day. R. at 61. The vocational

expert explained that "there are jobs within a light level where somebody is not having to stand

12

and walk for that amount of time." Id.  Mr. Walters asked the vocational expert to consider an individual who could only stand and walk two hours in an eight-hour work day, and the vocational expert testified that such an individual would be limited to sedentary work. Id.

### Decision of the Administrative Law Judge

The ALJ determined that Mr. Walters meets the insured status requirements of the Act through December 31, 2018. The ALJ determined that Mr. Walters has not engaged in substantial gainful activity since October 28, 2014, the alleged disability onset date. The ALJ found that Mr. Walters has the following severe impairment: degenerative disc disease of the lumbar spine. The ALJ determined that Mr. Walters does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  In making this determination, the ALJ considered whether Mr. Walters' degenerative disc diseases meets or medically equals the requirements of Section 1.04 of the listings, disorders of the spine.

The ALJ next found that Mr. Walters has the residual functional capacity to perform a reduced range of light work as defined in 20 C.F.R. § 404.1567(b). The ALJ found that Mr. Walters can lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk a total of four hours in an eight-hour work day; sit a total of six hours in an eight-hour work day; occasionally push and/or pull with the right lower extremity and frequently push and/or pull with the left lower extremity; never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs, balance, and stoop; and occasionally kneel and crouch. The ALJ also found that Mr. Walters must avoid exposure to moving machinery and unprotected heights.

The ALJ determined that Mr. Walters is unable to perform any past relevant work. The ALJ determined that Mr. Walters was born on June 13, 1963, and was 51 years old, which his

defined as an individual closely approaching advanced age, on the alleged disability onset date. The ALJ determined that Mr. Walters has at least a high school education and is able to communicate in English. The ALJ determined that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether the claimant has transferable job skills. The ALJ determined that considering Mr. Walters' age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Mr. Walters can perform. In so finding, the ALJ relied on the testimony of a vocational expert. Finally, the ALJ concluded that Mr. Walters has not been under a disability, as defined by the Act, from October 28, 2014, through the date of the decision.

## Statement of Issues on Appeal

Issue No. 1.    Whether substantial evidence supports the ALJ's residual functional capacity finding.

## Analysis

### I. Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the

evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    Entitlement to Benefits under the Act.

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

(1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

<u>Perez</u>, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." <u>Id.</u> Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. <u>Id.</u>  An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. <u>Id.</u>

## I.    **<u>Plaintiff's Appeal</u>**.

Issue No. 1.    Whether substantial evidence supports the ALJ's residual functional capacity finding.

### a. *Parties' Arguments*

Mr. Walters argues that the ALJ's residual functional capacity ("RFC") finding is not supported by substantial evidence because it is based only on the findings of the non-examining state agency consultant and rejects the findings of the examining physicians, including Mr. Walters' primary care practitioner Dr. Zerangue, his neurosurgeon Dr. Oberlander, and the consultative examiner Dr. Loupe. He argues that the opinion of the state agency consultant should not outweigh the opinion of the treating physician and examining sources. Indeed, Mr. Walters is correct that "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" <u>Newton v. Apfel</u>, 209 F.3d 448, 455 (5th Cir. 2000) (<u>Martinez v. Chater</u>, 64 F.3d 172, 176 (5th Cir. 1995)). The regulations explain that medical opinions from a treating source are generally given more weight, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(c). However, "when good cause is shown, less weight, little weight, or even no weight

may be given to the physician's testimony." <u>Myers v. Apfel</u>, 238 F.3d 617, 621 (5th Cir. 2001) (quoting <u>Greenspan v. Shalala</u>, 38 F.3d 232, 237 (5th Cir. 1994)). Good cause exceptions "include disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." <u>Id.</u> (quoting <u>Greenspan</u>, 38 F.3d at 237). The Fifth Circuit requires that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." <u>Newton</u>, 209 F.3d at 453. Those factors are as follows:

> (1) the physician's length of treatment of the claimant,
> (2) the physician's frequency of examination,
> (3) the nature and extent of the treatment relationship,
> (4) the support of the physician's opinion afforded by the medical evidence of record,
> (5) the consistency of the opinion with the record as a whole; and
> (6) the specialization of the treating physician.

<u>Id.</u> at 456.

Mr. Walters cites <u>Newton v. Apfel</u>, where the ALJ relied on the findings of a testifying medical expert who had no expertise in the area of alleged disability, who did not examine the claimant, whose opinion was based on only part of the written medical record, whose opinion did not take into account the other medical opinions supporting the claimant's claim of disability, and who failed to consider the side effects of treatment. 209 F.3d 448, 457 (5th Cir. 2000). The United States Fifth Circuit Court of Appeals held that the ALJ's reliance on the medical expert's "conclusory and unsubstantiated opinion" that the claimant was not disabled was improper and that the ALJ's RFC was not supported by substantial evidence. <u>Id.</u>  The court of appeals also

required that on remand, the ALJ should analyze the §404.1527(d) factors before declining to give any weight to the opinions of the claimant's treating specialist. Id. at 456.

Mr. Walters also cites Hudson v. Apfel, where the district court held that under Newton, "the ALJ's reliance on the opinion of [non-examining clinical psychologist], who is not a medical doctor, and who only reviewed medical records in evidence does not constitute substantial evidence to support a finding of no disability." No. 3:99-CV-946-AH, 2000 WL 547121, at *3 (N.D. Tex. May 3, 2000). Mr. Walters further cites Warncke v. Harris, where the Fifth Circuit stated that "[w]e accord little weight to the opinion of a reviewing physician if it is contrary to the opinion of the only physician to examine the patient." 619 F.2d 412, 416 (5th Cir. 1980). In Warncke, however, the decision of the ALJ was affirmed. Id. at 417. The Fifth Circuit found the evidence in the record supported the reviewing physician's testimony and that the reviewing physician's conclusion was not inconsistent with the treating physician's statement that the claimant was "unable to work indefinitely due to arthritic condition in his shoulders" because that statement was made four months prior to the claimant receiving a percutaneous stimulator, which the claimant testified eased his pain. Id. at 416-17. The Fifth Circuit also found the treating physician's statement so brief and conclusory that it lacked "strong persuasive weight." Id. at 417.

Mr. Walters argues that all the medical sources who actually examined Mr. Walters concluded that he was unable to work. Mr. Walters says that Dr. Zerangue's opinions about Mr. Walters' abilities in the form he filled out on March 29, 2016, were based on MRIs and x-rays and a long history of treatment. In that form, Dr. Zerangue opined that Mr. Walters could only sit for two hours and only stand or walk for two hours in an eight-hour work day, that the medication Mr. Walters takes causes drowsiness and sedation, and that Mr. Walters would need breaks lasting 30

minutes four times a day. Mr. Walters argues that Dr. Zerangue's opinions are not conclusory. Mr. Walters points to the conclusions of his neurosurgeon Dr. Oberlander who noted on March 6, 2015, that Mr. Walters should remain out of work. Dr. Oberlander also stated that it would take a year for Mr. Walters to heal. Finally, Mr. Walters points to the conclusion of the consultative examiner that Mr. Walters was disabled from work.

Mr. Walters complains that despite this evidence, the ALJ failed to find that his back condition coupled with the side effects from medication were more physically limiting than what was opined by the non-examining state agency physician. He points out that he testified that he still experiences difficulty sitting, standing, and walking and needs to lay on his heating pad due to the severe pain. He testified that he had been unable to see his doctor and receive orthopedic care because he lost his medical insurance. Mr. Walters insists that the record is consistent that he suffers from significant limitations due to his back pain that are severe enough to keep him from working. He argues that the ALJ must consider the entire record and cannot pick and choose only the evidence to support the decision. Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000). Mr. Walters adds that his significant work history shows that he has a desire to work and is not exaggerating. E.g., O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003) (finding that "as the ALJ noted, [the claimant's] prior work history [showing a fourteen-year record of responsible and well-paying jobs in the computer field] and persistence in seeking medical treatment for her complaints support her credibility"); Felisky v. Bowen, 35 F.3d 1027, 1041 (6th Cir. 1994) ("Additional factors supporting [the claimant's] credibility are that she had a long, 17 year, work history and that her alleged disability can be traced to a specific onset date; it is not the result of a gradually worsening problem."); Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a

disability."); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 409 (3d Cir. 1979) ("[W]hen the claimant has a work record like [plaintiff's] twenty-nine years of continuous work, fifteen with the same employer his testimony as to his capabilities is entitled to substantial credibility.").

Mr. Walters argues that substantial evidence does not support the ALJ's RFC findings and further that the record supports a ruling by this Court that Mr. Walters is entitled to benefits because the vocational expert testified that if Mr. Walters could only stand for two hours in an eight hour work day (as opined by Dr. Zerangue), then Mr. Walters would be limited to sedentary work and under Grid Rule 201.14, Mr. Walters should be found disabled since he has no skills that would transfer to sedentary work.

The Commissioner argues that substantial evidence supports the ALJ's RFC determination. First, the Commissioner points out that the ALJ has the sole responsibility for assessing the RFC. <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1023 (5th Cir. 1990). Further, the Commissioner submits that Mr. Walters bears the burden of showing that the evidence supports a greater functional limitation than in the RFC.[2] The Commissioner urges the court to uphold the ALJ's decision.

The Commissioner argues that the ALJ recited objective medical findings to support the RFC. For example, the ALJ noted Dr. Oberlander's finding that Mr. Walters would take a year to heal from surgery. But the ALJ also noted that since the surgery, physical examinations in 2015 and 2016 recorded normal range of motion, no joint abnormality, and no edema or tenderness. Mr. Walters also exhibited a stable gait and normal extremity strength and muscle tone. The Commissioner points out that the ALJ also noted Mr. Walters' statement that he remained able to

---

[2] For this proposition, the Commissioner cites <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994), where the court explained that because under the regulations the claimant bears the initial burden of showing he is disabled, he bears the burden of proof on the first four steps of the sequential analysis.

help around the house with chores such as laundry, sweeping, and taking out the trash; could drive short distances; and could maintain concentration to watch TV from time to time. The Commissioner argues that such normal findings and an ability to engage in daily activities supports the ALJ's RFC determination.

The Commissioner insists that contrary to Mr. Walters' suggestion, the ALJ did not "pick and choose" evidence in the record, but instead resolved conflicts in the evidence as the ALJ is expressly tasked to do. Jones v. Heckler, 702 F.2d 616, 621 (5th Cir. 1983) ("It is within the administrative law judge's discretion to resolve the issue of conflicting evidence."). The Commissioner insists that it is beyond the scope of this court's review to evaluate the accuracy of the ALJ's analysis of the medical evidence. See Fontenot v. Colvin, 661 F. App'x 274, 277 (5th Cir. 2016) (unpublished) (holding that "[t]he RFC must be upheld under the substantial evidence standard, because reliance on the analysis of these doctors is more than a mere scintilla, and any evaluation of the accuracy of the analysis is beyond the scope of this court's review").  The Commissioner argues that the ALJ did not ignore the findings of the examining physicians. Instead, the Commissioner considered the opinions of S. Calkins, M.D. (the state agency reviewing physician), Dr. Oberlander, Dr. Loupe, and Dr. Zerangue. The Commissioner points out that Dr. Calkins reviewed Mr. Walters' medical records from 2014 through 2016 and opined that Mr. Walters could perform light work with additional limitations. The Commissioner argues that the ALJ properly assigned significant weight to this opinion due to Dr. Calkins' comprehensive review of the evidence.

Moreover, the Commissioner submits that the ALJ did not rely solely on Dr. Calkins' opinion, but properly resolved the conflicts in the evidence.  The Commissioner argues that the ALJ properly gave only some weight to the opinion of Dr. Oberlander that Mr. Walters was unable

to return to work. The ALJ gave the opinion some weight because it reflects Mr. Walters' inability to return to his previous medium and heavy work jobs. The Commissioner argues that although Mr. Walters relies on Dr. Oberlander's opinion that he must remain out of work completely, a complete inability to work is a conclusion of disability which is a decision reserved to the Commissioner. Opinions on decisions reserved to the Commissioner are not entitled to any weight. See 20 C.F.R. § 404.1527(d).[3]

The Commissioner argues that the ALJ's assessment of Dr. Loupe's opinion was also appropriate. Dr. Loupe opined that Mr. Walters had only a 20% impairment to his body as a whole and only a 10% impairment to his right knee and that he was "disabled from work." The ALJ noted that this finding was in contradiction to Dr. Loupe's own largely normal physical examination findings and the other normal physical examinations in the record. The Commissioner argues that the ALJ was free to discount Dr. Loupe's opinion because the evidence supports a contrary conclusion. Martinez v. Chater, 64 F.3d 172, 176 (5th Cir. 1995) (holding that the treating physician's opinion was not entitled to controlling weight because the doctor failed to provide a medical explanation for his opinion and because it was inconsistent with the opinions of two consultative examiners who performed clinical testing). Additionally, the Commissioner argues that like Dr. Oberlander's opinion, Dr. Loupe's opinion that Mr. Walters was "disabled from work" is a disability finding reserved to the Commissioner that is not entitled to special weight.

---

[3] The regulations provide that:

> We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.
> . . .
> We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described [above].

20 C.F.R. § 404.1527(d).

The Commissioner argues that the ALJ had good cause to give little weight to Dr. Zerangue's opinion on Mr. Walters' functional limitations. The Commissioner points out that the ALJ noted that Dr. Zerangue was a non-specialized treating physician and determined that Dr. Zerangue's highly restrictive opinion was inconsistent with his own treatment notes and other evidence in the record. The Commissioner adds that Mr. Walters' ability to maintain daily activities and the physical examinations that show normal findings support the ALJ's decision to discount Dr. Zerangue's opinion.

The Commissioner also agues that even if there is no opinion evidence to support the RFC, this does not require reversal. The Commissioner cites Ripley v. Chater, where the Fifth Circuit considered whether the ALJ had failed to develop the record fully and fairly when concluding that the claimant was capable of performing sedentary work although there was no medical testimony to support that conclusion. 67 F.3d 552, 557 (5th Cir. 1995). The Fifth Circuit explained that:

> Usually, the ALJ should request a medical source statement describing the types of work that the applicant is still capable of performing. The absence of such a statement, however, does not, in itself, make the record incomplete. In a situation such as the present one, where no medical statement has been provided, our inquiry focuses upon whether the decision of the ALJ is supported by substantial evidence in the existing record.

Id. (footnote omitted). The Commissioner insists that substantial evidence supports the ALJ's findings and the court must uphold those findings.

In response to Mr. Walters' argument that his prior work history supports a finding that it is only his disability that is preventing him from working, the Commissioner argues that the regulations do not provide that previous continuous work "enhances" a claimant's credibility or the reliability of his reported symptoms. Moreover, the Commissioner cites Frank v. Barnhart, where the claimant said she would rather work, but the ALJ decided the statement was not credible because she had been unemployed for five years before she was injured. 326 F.3d 618, 621 (5th

Cir. 2003). The Fifth Circuit did not address whether the ALJ had relied on impermissible factors in assessing her credibility because the conclusion that the claimant could work was supported by the medical evidence and relied very little on the ALJ's credibility assessment. Id.  The Fifth Circuit added that "[i]t is inconceivable that the ALJ would have reached a different conclusion on this record, even had the ALJ accepted at face value [claimant's] statement that she would prefer to work." 326 F.3d 618, 622 (5th Cir. 2003). The Commissioner also cites a case out of the Middle District of Louisiana, where the court held that "[w]hile a claimant's work history is one of many factors to consider in assessing credibility, 20 C.F.R. § 404.1529(c)(3), it does not, on its own, warrant affording 'substantial credibility' to a claimant's testimony, as Plaintiff argues." Carroll v. Colvin, No. 15-687-JWD-RLB, 2016 U.S. Dist. LEXIS 181976, at *12 (M.D. La. Dec. 29, 2016).

    *b.  Analysis*

    The undersigned finds that the ALJ's RFC is supported by substantial evidence. The ALJ considered all of the objective and opinion evidence, including Mr. Walters' testimony. Considering the treatment records, surgical history, and overall benign objective findings on physical examinations since the surgery despite continued reports of pain, the ALJ assigned the RFC discussed above. The ALJ afforded significant weight to the opinion of the state-agency physician, adopting most of the limitations in Dr. Calkins' RFC.[4] The ALJ did not err in doing so.

---

[4] Dr. Calkins' determined that Mr. Walters has the following exertional limitations: can lift 20 pounds occasionally and 10 pounds frequently, can stand and/or walk (with normal breaks) for a total of four hours and sit (with normal breaks) for a total of 6 hours in an 8-hour work day, and has a limited ability to push and/or pull in both lower extremities. R. at 72. Dr. Calkins explained that Mr. Walters' internal derangement/effusion of the right knee and his L4-5 lumbar fusion limits the amount he can lift and carry, but Dr. Calkins noted that Mr. Walters can do laundry and drive. Id.  Dr. Calkins determined that Mr. Walters has the following postural limitations: can climb ramps and stairs frequently; can never climb ladders, ropes, and scaffolds; can balance and stoop frequently; can kneel and crouch occasionally; and can crawl without limitation. R. at 72-73. Dr. Calkins explained that Mr. Walters' internal derangement/effusion of the right knee and his L4-5 lumbar fusion affects kneeling and crouching, but noted that Mr. Walters can drive and examination shows normal strength. R. at 73. Dr. Calkins also explained that the lumbar L4-5 fusion prevented Mr. Walters from using ladders. Id.  Dr. Calkins also found that Mr. Walters should avoid

24

The ALJ recognized that Dr. Calkins was a non-treating, non-examining medical source, but noted that Dr. Calkins' opinion was based upon a thorough review of the available medical record and a comprehensive understanding of agency rules and regulations. The ALJ also found Dr. Calkins' opinion to be internally consistent and supported by a reasonable explanation. Further, the ALJ found Dr. Calkins' opinion was consistent with Mr. Walters' treatment records, including the fairly benign findings on physical examination since his surgery and the no more than mild to moderate findings on diagnostic testing of Mr. Walters' lumbar spine and extremities. And indeed, Mr. Walters' December 2014 lumbar x-ray showed mild to moderate degenerative disc disease. His April 2015 shoulder x-rays showed osteoarthritis and his April 2015 hip x-rays showed no suspicious hip abnormalities. There are no other post-surgery x-rays or MRIs in the record. Further, when Mr. Walters presented to the Lallie Kemp clinic in November 2015, February 2016, and July 2016, he had a stable gait and muscle tone and strength in the bilateral upper and lower extremities was intact. When he presented at Lallie Kemp in October 2015, a past medical history of chronic back pain was noted, but he did not complain of back pain and complained of right knee pain for three months that was mildly relieved by a Norco regimen. He was found to have normal range of motion. On the other hand, when Mr. Walters visited Dr. Zerangue in April 2015, June 2015, September 2015, December 2015, March 2016, June 2016, and September 2016, his gait was reported to be slow and stiff or antalgic. But there is no indication in Dr. Zerangue's medical records that any testing of Mr. Walters' range of motion or strength was ever performed. Over the same time period, then, the medical records present inconsistent observations of Mr. Walters' condition, and it was the ALJ who was tasked with resolving those inconsistencies. See Jones, 702 F.2d at 621; see Huskey v. Colvin, 560 F. App'x 367, 370 (5th Cir. 2014) ("The ALJ may make

---

concentrated exposure to hazards like machinery and heights because his internal derangement/effusion of the right knee and his L4-5 lumbar fusion may affect his balance. Id.

credibility and weight determinations as to all medical opinions."). The ALJ did not do so by playing doctor himself. The ALJ relied on the opinion of medical source Dr. Calkins, who had reviewed all of the available the medical records.

The court requested additional briefing from the parties to address whether the ALJ here was required to consider the factors set forth in 20 C.F.R. § 404.1527(d)(2) before discounting the opinion of treating physician Dr. Zerangue. As noted above, in Newton, the Fifth Circuit required that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." <u>Newton</u>, 209 F.3d at 453. It follows that the criteria are not required to be considered where there is contrary medical evidence. Indeed, in several unpublished decisions, the Fifth Circuit has " held that ALJs are not required to consider the § 404.1527(c) factors before dismissing a treating physician's opinion if there is competing first-hand medical evidence contradicting that opinion." <u>Jones v. Colvin</u>, 638 F. App'x 300, 304 (5th Cir. 2016); <u>see</u> <u>Hamilton-Provost v. Colvin</u>, 605 F. App'x 233, 240 (5th Cir. 2015) (holding that the ALJ was not required to consider the six factors before rejecting the treating physician's opinion where the opinion was "controverted by evidence from other examining and treating physicians"). For example, in <u>Qualls v. Astrue</u>, the Fifth Circuit held that the ALJ did not err in declining to give the treating physician's opinion controlling weight without performing the Newton analysis where "the ALJ *was* presented with substantial evidence" contradicting the opinion, including the doctor's own records of improvement in symptoms, the opinions of other treating physicians that the claimant's limitations were not disabling, and the opinion of one of two examining physicians that she was not so disabled that she could not perform sedentary work. 339 F. App'x 461, 466 (5th Cir. 2009) (emphasis in

original). Similarly, in <u>Zimmerman v. Astrue</u>, the Fifth Circuit rejected the claimant's argument that the ALJ improperly disregarded his treating physician's opinion without considering the six factors where competing first-hand medical evidence contradicted that opinion, including records indicating pain medication was effective, the consulting examiners' finding of full motor strength, MRIs indicating only mild problems, and the claimant's own testimony about his every day activities.  288 F. App'x 931, 935–36 (5th Cir. 2008). The court also found that the ALJ's discussion of the opinion indicated that he had considered the factors. <u>Id.</u>

Here, as the Commissioner points out, the medical records from Lallie Kemp, the objective findings of consultative examiner Dr. Loupe, the observations of Dr. Oberlander, the x-rays in the record, and Mr. Walters' testimony about the daily activities he can perform contradict Dr. Zerangue's opinion. Where there is competing first hand medical evidence as in the cases discussed above, the ALJ is not required to consider the § 404.1527(c) factors. Importantly, although the ALJ did not explicitly consider the § 404.1527(c) factors, the ALJ's rejection of Dr. Zerangue's opinions in the March 2016 questionnaire was not cursory. The ALJ found that Dr. Zerangue is a primary care physician with no particular specialty; that his records were sparse, varied in legibility, and contained little to no objective findings other than vital signs and an antalgic gait; and that the severity of the limitations in the March 2016 statement were not entirely supported by the other evidence in the record including the fairly benign findings by the neurosurgeon, the consultative examiner, and at the Lallie Kemp hospital. The Lallie Kemp findings are discussed above. The consultative examiner, Dr. Loupe, found Mr. Walters had full range of motion in his lumbar spine, and no joint swelling, tingling, tenderness, or muscle weakness. The neurosurgeon, Dr. Oberlander, found the post-surgery x-rays looked good and that

Mr. Walters appeared to be solidly fused after his surgery, despite continued complaints of pain. The ALJ did not err in discounting the opinions of Dr. Zerangue.

The undersigned also finds the ALJ's assessment of the opinion of Dr. Oberlander was appropriate. The ALJ gave some weight to Dr. Oberlander's opinion that Mr. Walters could not return to his past work. Indeed, the ALJ found the record supported a finding that Mr. Walters could not return to his truck driving work. It appears Mr. Walters may interpret Dr. Oberlander's opinion as finding that Mt. Walters could not perform any work. The court disagrees. Dr. Oberlander's noted in January 2015 that Mr. Walters was "still unable to work and may try to get disability due to the fact that he is unable to return to his job with restrictions." This statement, which may simply be a report by Mr. Walters and not an independent assessment, clearly contemplates Mr. Walters' inability to return to the work he had been performing. Similarly, Dr. Oberlander's opinion in March 2015 that Mr. Walters should remain out of work is reasonably interpreted as referring to the kind of work Mr. Walters had been performing. Moreover, as the Commissioner points out, an opinion that a person is completely unable to work is a finding of disability. Such opinions are not entitled to any special weight because disability is a determination for the Commissioner to make. See 20 C.F.R. § 404.1527(d).

The undersigned finds the ALJ's assessment of the opinion of Dr. Loupe was appropriate. The ALJ found Dr. Loupe's opinion that Mr. Walters has "20% impairment to the body as a whole and 10% impairment to the right knee and is disabled from work" was not supported by the fairly normal findings in Dr. Loupe's physical examination or by the findings of more recent physical examinations. Indeed, Dr. Loupe found Mr. Walters had normal range of motion, no sensory loss in his lower extremities, although he had difficulty with heel and toe walk and extreme pain in medial aspect of the right knee joint with compression. The ALJ cited Mr. Walters' December

2014 x-ray with an impression of mild moderate disc disease and the Lallie Kemp medical records discussed above.  Further, as noted above, an opinion that claimant is "disabled from work" is not entitled to special weight because disability is a determination for the Commissioner.

The cases cited by Mr. Walters are distinguishable. In <u>Newton</u>, the ALJ was reversed for rejecting the findings of a treating specialist based on the testimony of a non-examining medical expert with no expertise whose opinion was not based on the full medical record. 209 F.3d at 457 Here, the opinion of Dr. Calkins relied on by the ALJ was based on a review of the entire 2014-2016 medical record including the opinion and records of Dr. Zerangue. In <u>Hudson</u>, the ALJ was reversed for relying on the opinion of an individual who was not a medical doctor. 2000 WL 546121, at *3. Here, Dr. Calkins is a medical doctor. In <u>Warncke</u>, cited for the proposition that the opinion of a reviewing physician is entitled to little weight if it conflicts with the opinion of the examining physician, the Fifth Circuit affirmed the decision of the ALJ. 619 F.2d at 416. The Fifth Circuit found the opinion of the reviewing physician was not inconsistent with the opinion of the treating physician because the treating physician's opinion was made prior to the claimant receiving a percutaneous stimulator, which the claimant testified eased his pain. <u>Id.</u>  The court observed that "[i]n situations like this one, when other evidence in the record supports a conclusion contrary to the opinion of an examining physician, the Secretary's regulations allow the ALJ to reject the opinion of the examining physician." <u>Id.</u>  at 417. Like <u>Warncke</u>, medical evidence and testimony in the record here supports a conclusion contrary to the opinion of Dr. Zerangue.

As to Mr. Walters' argument that his past work history compels a finding that his testimony about his pain and functional limitations is credible, the court notes that Mr. Walters has not pointed to a case within this circuit imposing such a rule. As a court in the Middle District of Louisiana noted, the claimant's work history is one factor to consider but does not, on its own,

warrant a finding of substantial credibility. See Carroll, 2016 U.S. Dist. LEXIS 181976, at *12. Here, while Mr. Walters has a consistent past work history, this alone does not mean that his testimony must be accepted at face value where the medical evidence substantially supports a contrary conclusion.

For the foregoing reasons, the undersigned finds that the ALJ's RFC is supported by substantial evidence and that the ALJ did not err in relying on the opinion of the non-reviewing examiner over the opinion of the examining physicians.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 17) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 18) be GRANTED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this 19th day of July, 2019.

Janis van Meerveld
United States Magistrate Judge